United States Court of Appeals,

Eleventh Circuit.

No. 94-3617.

UNITED STATES of America, Plaintiff-Appellee, Cross-Appellant,

v.

Reinhard P. MUELLER, Defendant-Appellant, Cross-Appellee.

Feb. 14, 1996.

Appeals from the United States District Court for the Middle District of Florida. (No. 94-90-Cr-Orl-18), G. Kendall Sharp, Judge.

Before BIRCH, Circuit Judge, and CLARK and WEIS [*], Senior Circuit Judges.

WEIS, Senior Circuit Judge:

Defendant was convicted on one count of tax evasion and two counts of tax perjury based on his failure to report and pay tax on funds he acquired by failing to distribute a liquidating dividend of a corporation he controlled. We determine that there was adequate evidence to sustain those judgments.

Defendant was also convicted on one count of bank fraud arising from the liquidation. However, we conclude that the defendant's conduct in obstructing discovery and filing misleading pleadings in a civil suit brought by a financial institution to recover dividends due it did not constitute criminal conduct under the bank fraud statute. We accordingly direct acquittal on that count.

The district court sentenced defendant to incarceration for fifty-one months, a fine of $50,000, and a term of three years

[*]Honorable Joseph F. Weis, Jr., Senior U.S. Circuit Judge for the Third Circuit, sitting by designation.

supervised release. In addition, defendant was ordered to pay restitution in the amount of $654,735.51 on the condition, however, that if he paid the fine and made restitution, the prison term and supervisory release would terminate.

The prosecution against defendant arose out of his actions as majority shareholder, president, and director of Omni Equities, Inc., formerly known as A.T. Bliss & Company. In April 1986, at his request, Omni's three-member Board of Directors voted to liquidate the company. Defendant became trustee for the shareholders of Omni with the authority to distribute liquidating dividends to them.

The Depository Trust Company, a federally chartered institution, was a substantial shareholder in Omni, and failing to receive a liquidating dividend, filed a civil suit in October 1986 against Omni and defendant in Florida state court. Ultimately, Depository Trust was granted summary judgment, but recovered only $10,259 of the $665,000 awarded in its favor.

Defendant has appealed his convictions, asserting that the evidence was insufficient, the trial court erred in admitting the deposition of a witness taken in a foreign country, and the prosecutor made improper comments to the jury in his summation. The government has cross-appealed the sentence imposed by the trial court.

## I.

### THE TAX COUNTS

#### A. Tax Evasion

Count one of the indictment charged defendant with evasion of

tax due for the year 1986.  On April 8, 1986, two days before the Omni board approved action to liquidate the company, defendant sold his shares in Omni for $1,117,104 to R. Mueller & Sons, Ltd., of London, England.  According to the government, R. Mueller & Sons was the new name given to an English "shelf corporation," an entity that can be acquired and used by anyone under whatever name one chooses.  After activating R. Mueller & Sons through acquisition of the shelf corporation, defendant controlled it and handled its financial affairs.

Omni's primary asset consisted of shares in MagnaCard.  On April 26, 1986, Omni sold its holdings in MagnaCard to Jacob Growth Capital, Ltd., an English company, for $3.6 million.  The sale was made through Walter L. Jacob & Co., a London securities dealer.  The relationship between Jacob Growth Capital and Walter L. Jacob & Co. is not clear from the record.  Three days later, defendant directed that $2.3 million of proceeds due Omni from the sale of MagnaCard be sent to R. Mueller & Sons as a liquidating dividend, and that $940,000 be delivered to Omni's lawyers in Florida.  The latter amount was eventually deposited in an account at Meritor Bank, Lakeland, Florida, in the defendant's name as trustee for Omni's stockholders.

On May 4, 1986, defendant began to draw dividend checks from the Meritor account and mailed them to stockholders with a letter explaining Omni's liquidation.  Later, defendant withdrew $650,000 from the Meritor account in order to reduce Omni's exposure to pre-judgment attachments.  However, by August 1986, that sum was redeposited to honor checks issued as liquidating dividends.

On August 19, 1986, defendant directed Meritor Bank to wire $485,177.37 (apparently the balance of the account) to Walter L. Jacob & Co., Barclays Bank, London. Defendant asserted that this account was a contingency fund set up to meet potential claims against Omni's officers arising out of the liquidation of the company. Subsequently, all of Omni's funds at Walter L. Jacob & Co. were transferred to an account in Hong Kong maintained by Walter L. Jacob.

Depository Trust never received the $496,437.50 in liquidating dividends from Omni to which it was entitled, although defendant maintained that he had mailed checks to Depository Trust in May 1986.

In his 1986 income tax return, defendant and his wife reported adjusted gross income of $159,525, and a loss of $156,025 from the defendant's sale of Omni stock to R. Mueller & Sons. The government contended that defendant failed to report as income the $486,178 due Depository Trust (the amount of the liquidating dividend less the $10,259 recovered from an attachment against Omni's account). In addition, the government asserted that as a result of his sale of Omni stock to R. Mueller & Sons, defendant realized a capital gain of $911,975, rather than the loss he reported.

Defendant argued that he never received the $485,000 wired from the Meritor Bank account to Barclays Bank, insisting instead that it went to Walter L. Jacob & Co. He also contended that Walter L. Jacob & Co. did not lay out cash for the MagnaCard stock. Instead, as partial payment, Jacob offset approximately $1 million

it had loaned to defendant.  Jacob provided the remainder of the sale price by issuing debentures, which were never paid.

We need not decide whether there was sufficient evidence for the jury to convict defendant of tax evasion on the sale of stock to R. Mueller & Sons because the verdict could properly have been based on the defendant's exercise of control over the money due Depository Trust.

26 U.S.C. § 7201 provides that "[a]ny person who willfully attempts in any manner to evade or defeat any tax ... shall ... be guilty of a felony...."  Gain, lawful or unlawful, constitutes taxable income "when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it."  *Rutkin v. United States,* 343 U.S. 130, 137, 72 S.Ct. 571, 575, 96 L.Ed. 833 (1952).  *See also Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426, 431, 75 S.Ct. 473, 477, 99 L.Ed. 483 (1955) (receipt of punitive damages taxable);  *United States v. Schmidt,* 935 F.2d 1440, 1448 (4th Cir.1991) (dominion and control of property makes it taxable);  *In re Bentley,* 916 F.2d 431, 432 (8th Cir.1990) (increase in wealth over which taxpayer has dominion is taxable).

Viewing the evidence in the light most favorable to the government, *United States v. Morris,* 20 F.3d 1111, 1114 (11th Cir.1994), as we must in an appeal from a conviction, we conclude that the jury was entitled to find that defendant exercised sufficient control over the $485,177 due Depository Trust to make it taxable to him.  The money went to an account at Barclays Bank, ostensibly for an Omni contingency fund, but was actually for the

defendant's benefit.

Although supposedly designed to protect former officers and directors of Omni, the contingency fund was not so used. In one instance, when the former secretary and director of Omni was sued for participation in the liquidation, she received no assistance from the Barclays account. Pursuant to the defendant's instructions, no withdrawal from the account was permitted without his prior written authorization. None of the directors were aware of the existence of the account, and at the time the deposit was made, the jury could find that Omni, in fact, was but the defendant's alter ego. Although defendant contends that he was acting only as an agent or conduit for Omni, the jury was free to reject that position under the evidence presented by the government.

## B. Tax Perjury

The bulk of the evidence presented on counts three and four, the tax perjury charges, involved the same facts as those underlying the tax evasion charge. Specifically, the indictment alleged that in his 1986 income tax return and 1988 amended return, defendant failed to report as income the money owed Depository Trust; failed to report as income the liquidating dividend received by R. Mueller & Sons; reported a capital loss instead of a gain from his sale of Omni stock to R. Mueller & Sons; and underreported his adjusted gross income. To the extent that these charges mirror the tax evasion count, defendant does not raise any additional arguments.

However, defendant was also charged with falsely checking the

"no" box on his 1986 return that asked whether he had signature or other authority over a foreign bank account. It is not disputed that, in fact, he did have such power. Defendant contended that the matter was simply a mistake, and he produced evidence that on July 31, 1987, he filed a form with the IRS in Detroit reporting his connection with the London bank accounts. However, he had filed his tax return at the IRS office in Atlanta.

The government points out that, when defendant filed an amended return on October 3, 1988, again in Atlanta, he did not correct the false statement about the foreign bank accounts. The determination of whether the misrepresentation about the bank accounts was willful, or merely a mistake, is a typical issue for a jury to resolve, and here it decided against defendant.

We conclude, therefore, that there was adequate evidence to sustain the convictions on counts one, three, and four.

II.

THE DEPOSITION OF A FOREIGN WITNESS

Defendant maintains that the trial court erred in admitting the deposition of David Brailsford, an English citizen who lived in the London area and was unavailable to testify at trial. Brailsford was the Chief Examiner of the United Kingdom's Department of Trade and Industry, Company Investigations Division, and had investigated the activity of Walter L. Jacob & Co. Defendant contends that the reading of this deposition at trial violated the confrontation clause of the Sixth Amendment.

Depositions, particularly those taken in foreign countries, are generally disfavored in criminal cases. For an extensive

discussion, *see United States v. Drogoul,* 1 F.3d 1546, 1551 (11th Cir.1993). Nevertheless, depositions are authorized "when doing so is necessary to achieve justice and may be done consistent with the defendant's constitutional rights." *Id. See* Fed.R.Crim.P. 15.

In this case, the deposition took place in London. Defense counsel was present and cross-examined the witness. Defendant listened to the testimony on the telephone and was able to consult with his lawyer as the deposition proceeded. Unlike depositions taken in some foreign countries, *see, e.g., Drogoul,* 1 F.3d at 1554-55, the procedures here followed those used in the United States. There were no language barriers and defendant was able to participate and advise his counsel. Foreign depositions have been approved in similar instances, *United States v. Gifford,* 892 F.2d 263, 265 (3d Cir.1989), *see United States v. Kelly,* 892 F.2d 255, 262-63 (3d Cir.1989), and even in cases where the proceeding was in a foreign language and conducted by a judicial officer rather than counsel. *See United States v. Salim,* 855 F.2d 944, 954-55 (2d Cir.1988).

Defendant complains that he was not provided with copies of all the documents used at the deposition until several hours before it was scheduled. However, the documents were faxed to defendant and were available to him and his counsel as the deposition proceeded. In his brief to this Court, defendant has not cited any specific instance of prejudice caused by late receipt of the documents. We are satisfied that the district court properly permitted the introduction of deposition evidence in this case.

III.

PROSECUTORIAL MISCONDUCT

During his summation to the jury, the Assistant U.S. Attorney said that Mueller "lied on his affidavit submitted, he lied on his tax returns, he lied to Social Security Administration, he lied when he filled out and signed the tax return and I submit to you that not only goes to show his willfulness, but it also goes to show the credibility of the statements that have been given here."

Defendant did not object to these comments at trial, and consequently, we review only for plain error. *United States v. Wiggins,* 788 F.2d 1476, 1478 (11th Cir.1986). To meet that standard, a prosecutor's remarks during closing argument must be both improper and prejudicial to a substantial right of the defendant. *United States v. Thomas,* 8 F.3d 1552, 1561 (11th Cir.1993). A reversal is warranted when prosecutorial misconduct was so pronounced and persistent that it permeated the entire atmosphere of the trial. *United States v. McLain,* 823 F.2d 1457, 1462 (11th Cir.1987).

We do not approve of the remarks of the Assistant U.S. Attorney and, had an objection been raised at the time they were made, a sharp curative instruction would have been in order. It is improper for a prosecutor to directly convey his personal beliefs about a defendant's credibility in closing argument. However, in the circumstance of this case, we cannot say that the comments reached the level of plain error. As the Supreme Court stated in *United States v. Young,* 470 U.S. 1, 16, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985), "[v]iewed in context, the prosecutor's statements, although inappropriate and amounting to error, were not

such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice."  We conclude, therefore, that the prosecutor's final summation did not constitute reversible error.

## IV.

### THE BANK FRAUD COUNT

Much of the evidence previously discussed was not admissible on the bank fraud charge, although all counts were tried together despite the defendant's request for a severance.

In 1986, defendant entered into a plea agreement with the United States with respect to an indictment in the Southern District of Florida alleging criminal tax violations.  As part of the arrangement, the government was barred from bringing future charges against defendant pertaining to his involvement with Omni's predecessor, A.T. Bliss & Company.

After the indictment in the present case was filed in the Middle District of Florida, defendant sought enforcement of the plea bargain from Judge Ryskamp, who had approved it in the Southern District of Florida.  Judge Ryskamp granted the requested relief and issued an order reading:  "The United States is enjoined from presenting any evidence of Defendant Mueller's conduct, prior to November 7, 1986, with regard to [the bank fraud count] of the indictment pending against him in the Middle District of Florida."

The record in this case contains few details of the defendant's conduct after November 7, 1986 having any relevance to bank fraud.  What evidence there is consists of references to the suit that Depository Trust filed against Omni and defendant in the

Florida state court on October 15, 1986, asserting a claim for the liquidating dividend.  Apparently, defendant was not represented by counsel in that case, but prepared and filed an answer on November 19, 1986 for himself as well as for Omni.

In the trial of the case now before us, an official of Depository Trust testified that on December 11, 1986, defendant failed to appear for a state court deposition scheduled to be held in Lakeland, Florida.  Defendant, who lived in Fort Lauderdale, had objected to traveling to Lakeland, some distance from his home. The Depository Trust official further testified that on October 12, 1987, defendant filed an affidavit in the state court in which he gave his version of what had happened to the dividend checks in early 1986.

This witness also testified, without specificity, that defendant had failed to appear for depositions on other occasions. In addition, the witness discussed other events that occurred before November 7, 1986, which were admissible only as to the tax violation counts.  The official also identified a number of documents that defendant had produced during the course of the civil suit.  Finally, the witness described the garnishment proceeding on the defendant's bank account at the Meritor Bank, which yielded approximately $10,000.

In its brief, the government recognizes that to establish bank fraud in violation of 18 U.S.C. § 1344,[1] the prosecution "must

---

[1] 18 U.S.C. § 1344 reads:

>     Whoever knowingly executes, or attempts to execute, a scheme or artifice—

establish that the defendant engaged in or attempted to engage in a scheme or artifice to defraud a financial institution, and that the defendant acted knowingly." It is not disputed that Depository Trust is a financial institution within the ambit of 18 U.S.C. § 1344.

The government contends that there is sufficient evidence from which the jury could conclude defendant committed bank fraud. The bases of the government's position are that Depository Trust had a claim against defendant for $486,000; that the answer and affidavit defendant filed in the civil suit contained falsehoods; and that defendant delayed final resolution of the suit by obstructing discovery. In addition, we may also assume that after November 6, 1986, defendant had control of the funds at Barclays Bank and thus could have paid the debt owed Depository Trust, but did not.

At the conclusion of the government's evidence, defendant moved for acquittal on the bank fraud count. The trial judge denied the request stating: "Well [Depository Trust's lawsuit] in itself, would not be enough, but a jury question is formed as to whether or not the dealings in November of '87 with regard to transferring funds to [Euro International] and Venture Funding and

---

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

so forth, the jury can decide whether or not any of those funds were [Depository Trust] funds."

The trial judge was referring to a consolidation of a number of corporations through the exchange of stock and notes. The companies included Venture Funding, Ltd. into which R. Mueller & Sons had merged. All of the corporations received stock in a new entity, Euro International. Apparently, no cash was involved in these transactions, and significantly, on appeal the government does not argue that any of the $486,000 due Depository Trust was traced to these mergers.

As to the bank fraud count, therefore, the record establishes only that during the pendency of a civil suit in state court for the recovery of money due and owing, defendant delayed the ultimate entry of judgment by filing a false and misleading answer and affidavit, and slowed discovery.

As this Court explained in *United States v. Falcone,* 934 F.2d 1528, 1539 (11th Cir.1991), section 1344 covers two distinct types of bank fraud: subsection (a)(1) outlaws schemes to defraud federally insured financial institutions and subsection (a)(2) prohibits schemes to obtain funds from such institutions by means of false or fraudulent pretenses, representations, or promises. Because defendant did not obtain funds from Depository Trust, only subsection (a)(1), banning schemes to defraud, is pertinent to this case.

The courts have traditionally been wary of defining fraud for fear of creating opportunities for, or encouraging the creation of, dishonest schemes that lie outside the definition. Consequently,

case law on fraud is highly fact-bound and broad statements must be read in context.

The government has cited two cases in support of its position, but we do not find them persuasive. For example, in *United States v. Goldblatt,* 813 F.2d 619, 624 (3d Cir.1987), the court of appeals explained that fraud is measured by determining whether the scheme "demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community." In that case, the defendant, claiming money from a bank, was convicted of covering up the relevant fact that the withdrawal of his funds had been made by his son.

In *United States v. Solomonson,* 908 F.2d 358, 363 (8th Cir.1990), the Court observed: "[A]ctions that have the effect of delaying a complaint, making apprehension less likely, or giving a false sense of security to the victim can be considered part of a scheme to defraud." That case is of little help here because Depository Trust, the victim, was aware that it had been denied funds due it and had filed suit to recover them.

The parties have not provided us with authorities analogous to the facts presented here. However, several district court cases have held that the mail fraud statute does not extend to false statements by attorneys in the context of pending litigation. *McMurtry v. Brasfield,* 654 F.Supp. 1222, 1225 (E.D.Va.1987) (letters and affidavit mailed in custody dispute not mail fraud); *See also Paul S. Mullin & Assocs., Inc. v. Bassett,* 632 F.Supp. 532, 540 (D.Del.1986) (suggestion that attorney's actions could be mail fraud was "absurd"); *Spiegel v. Continental Ill. Nat. Bank,*

609 F.Supp. 1083, 1089 (N.D.Ill.1985), *aff'd* 790 F.2d 638 (7th Cir.1986) (correspondence concerning issue in pending litigation not mail fraud). These courts indicated that the appropriate remedy was notification of disciplinary authorities, or application for sanctions in the civil litigation. Because the bank fraud statute is modeled on the wire and mail fraud statutes, *see* H.R.Rep. No. 1030, 98th Cong., 2d Sess. 377, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3519, a similar standard should apply here.

It is highly unlikely that Congress intended the bank fraud statute to cover the situation before us. First, Depository Trust had no greater rights to the liquidating dividends than any other shareholder. It would be incongruous to extend the weapon of criminal penalties to Depository Trust when others in the same situation were not granted such rights.

If the government believed that the defendant's conduct in the civil suit merited criminal prosecution, the perjury statute would have been available. Unlike the crime of perjury, which extends to all litigants, applying the bank fraud statute here, as the government would have us do, would benefit only a limited class of litigants. We find nothing in the language of the bank fraud statute to create such sweeping protection for banks in the context of civil suits.

Nor do we find any indication that Congress intended to create such a basic interference with established norms in civil litigation as is urged here. Permitting the government to prevail on its theory would mean that a bank suing on a note could threaten the obligor with criminal sanctions if he delayed payment, although

a similar suit by a non-financial institution would have no such ramifications. The state court has ample means to enforce discovery procedures and invoke appropriate sanctions against offending parties—even when, as here, the litigant proceeded pro se. Damages for undue delay and obstruction of litigation, after all, may be imposed in civil proceedings.

We are persuaded that there was insufficient evidence on which a jury could find a violation of the bank fraud statute in this case, and accordingly, we direct the entry of judgment of acquittal on count two. *See Burks v. United States,* 437 U.S. 1, 16-18, 98 S.Ct. 2141, 2149-51, 57 L.Ed.2d 1 (1978) (double jeopardy bars retrial after appellate court determines evidence at trial was insufficient); *United States v. Baptista-Rodriguez,* 17 F.3d 1354, 1369 (11th Cir.1994); *United States v. Khoury,* 901 F.2d 948, 961 (11th Cir.1990).

V.

Because the conviction on count two is vacated, the case will be remanded to the district court for resentencing on the remaining counts. *See United States v. Young,* 953 F.2d 1288, 1290 (11th Cir.1992). However, there are a few matters that we must address first. The district court ordered defendant to make restitution based on the loss incurred by Depository Trust. Because the defendant's conviction for bank fraud is vacated, the order for restitution can no longer stand. Thus, the government's cross-appeal as to the restitution portion of the sentence is moot.

Defendant also asserts that the district court erred in sentencing him under the 1988 sentencing guidelines, the guidelines

in effect the year his offense was completed, rather than the 1994 Sentencing Guidelines, the ones applicable for the year he was sentenced. Defendant argues that because of changes in the computation of the tax loss used to determine his base offense level, he received a higher sentence under the 1988 guidelines than he would have received under the 1994 guidelines.

18 U.S.C. § 3553(a)(4)(A) provides that sentencing should ordinarily be made pursuant to the guidelines "that are in effect on the date the defendant is sentenced." However, because calculation under 1994 guidelines would have resulted in a longer sentence, the government contends that it was necessary to use the 1988 version. *See United States v. Lance*, 23 F.3d 343, 344 (11th Cir.1994) (noting ex post facto implications).

The defendant's sentence was based on "tax loss." Under the 1988 guidelines, tax loss included interest to the date of the filing of the indictment. The defendant's total tax loss was $1,134,215.03, which under the 1988 guidelines, corresponded to a base offense level of 16. The 1994 guidelines' definition of "tax loss" excludes interest, but part of the pertinent calculation involves the use of "unreported gross income."[2] The defendant interprets this term to mean "adjusted gross income." We reject that construction of the guideline and read it literally to apply to unreported gross income. In any event, the government insists

---

[2]U.S.S.G. 2T1.1(c)(1)(A) (1994) reads:

> If the offense involved filing a tax return in which gross income was underreported, the tax loss shall be treated as equal to 28% of the unreported gross income ... unless a more accurate determination of the tax loss can be made.

that a more accurate determination was made.

The record on this point is less than specific, but because the case must be remanded for resentencing, the parties may recalculate the sums at stake and if any disagreement remains, submit the matter to the sentencing judge for resolution.

The district court also ordered that if defendant served his full prison sentence, his fine would be waived. We fail to find, nor did the district court provide, any support for this unusual contingency.

The sentencing guidelines call for the imposition of fines in all cases, with limited exceptions for defendants who are unable, and not likely to become able, to pay all or part of a fine, or for those whose dependents would be unduly burdened. U.S.S.G. § 5E4.2 (1988); U.S.S.G. § 5E1.2 (1994). 18 U.S.C. § 3572 specifies the factors to be considered in imposing a fine. There is no provision in the statute or the guidelines for the expiration of a fine based on a defendant's service of his full term of incarceration. That portion of the sentence must therefore be deleted.

Accordingly, the judgments of convictions on counts one, three and four are AFFIRMED. The conviction on count two is REVERSED, and judgment of acquittal on that count must be entered in favor of the defendant. The case is REMANDED for resentencing.